CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
September 29, 2025
LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| RICHARD BRANDON DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:23-cv-00593 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| MAJOR C. KELLER, *et al.*, | ) | By:  Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendants. | ) | |

Plaintiff Richard Brandon Davis, a Virginia inmate proceeding *pro se*, filed this civil action against various prison officials and medical staff at the Western Virginia Regional Jail ("WVRJ"). (*See* Compl. [ECF No. 1].) Defendants Major Chad Keller, Major Derek Stokes, and Major Scott Booher (collectively, the "Moving Defendants") have jointly moved for summary judgment on Plaintiff's claims against them. (Defs.' Mot. for Summ. J. [ECF No. 75].) For the following reasons, the court will grant Defendants' motion and enter summary judgment in their favor.

I.

A. Plaintiff's Allegations

Plaintiff has long struggled with opioid use disorder ("OUD"). (*See* Compl. ¶ 11.) He started treatment with Suboxone for his OUD in 2018, when he was about 18 years old, and has continued that treatment daily since then. (*Id.* ¶¶ 14, 16.) In addition to the Suboxone, Plaintiff started receiving regular Sublocade[1] injections in June 2022. (*Id.* ¶ 17.) Plaintiff alleges

---

[1] Sublocade is an extended-release buprenorphine shot that is usually given once every 28 days in either a 100 mg or 300 mg dose. (Compl. ¶ 18.)

he has "had a great deal of success" because of his medication-assisted treatment ("MAT") with Suboxone. (*Id.* ¶ 19.)

On June 14, 2023, police arrested Plaintiff in front of his workplace on several warrants. (*Id.* ¶ 20.) On June 30, 2023, Plaintiff was transferred from the New River Regional Jail to the WVRJ. (*Id.* ¶ 21.) Upon his arrival, Plaintiff immediately told the intake nurse about his Suboxone treatment, and she verified his prescription and referred him to the jail's MAT program. (*Id.* ¶ 22, 24.) At that time, his treatment consisted of 8mg of Suboxone three times a day. (*Id.* ¶ 23.) Over the next few weeks, Plaintiff continued to request that he be placed in the MAT program and receive his Suboxone regimen. (*Id.* ¶ 25.)

On July 20, 2023, he met with Dr. St. Amour at WVRJ to discuss his treatment program. (*Id.* ¶ 26.) Dr. St. Amour ordered Plaintiff to take a drug test to check for Suboxone in his system. (*Id.* ¶ 27.) The test came back positive, and Dr. St. Amour prescribed Plaintiff 8mg of Suboxone twice per day to continue his treatment. (*Id.* ¶¶ 27–28.)

Plaintiff alleges that WVRJ staff mismanaged his medication. (*See id.* ¶¶ 30–32.) He claims he was not given his medication at proper times and, at one point, missed a dose. (*Id.* ¶ 30.) Another time, Plaintiff received a 16 mg dose all at once, which he told the nurse he was not used to. (*Id.* ¶¶ 31–32.) In response, the nurse, Megan Stout, allegedly told Plaintiff to "take it the way we give it to you or we put you down for refusal and you get nothing at all." (*Id.* ¶ 32.) Nurse Stout also allegedly told Plaintiff that Suboxone withdrawal was worse than heroin, but that she had no problem having the doctor remove someone from the treatment program. (*Id.* ¶ 33.)

On August 9, 2023, prison officials strip searched Plaintiff and thoroughly examined his mouth to check whether he was in possession of his medication. (*Id.* ¶ 35.) After the search, Plaintiff was cleared to return to his housing unit. (*Id.*) That same day, around 3:20 p.m., Major Stokes and Captain Booher approached Davis and told him that his Suboxone treatment was being discontinued because he was seen on camera "diverting" his medication. (*Id.* ¶ 38.) Major Stokes and Captain Booher acted under a policy that Plaintiff alleges was adopted and enforced by Major Keller. (*Id.* ¶ 5.) Plaintiff denied doing anything illegal with his Suboxone and expressed concern for his mental and physical health, including his sobriety, if his treatment regime was discontinued. (*Id.* ¶¶ 39, 42.) Major Stokes and Captain Booher then asked Plaintiff "why he didn't take this time to get off that 'junk.'" (*Id.* ¶ 40.) Plaintiff replied that he "felt safe" on Suboxone and has had a lot of success because of it. (*Id.* ¶ 41.) The officers told him if he felt unsafe, he could do time in restrictive housing; Plaintiff shook his head "no," and Major Stokes replied, "[T]hat's what I thought." (*Id.* ¶¶ 44, 45.) Plaintiff asked to see Dr. St. Amour about discontinuing his Suboxone, but Major Stokes and Captain Booher refused his request. (*Id.* ¶ 43.) Plaintiff had previously expressed his fear of relapse and overdose and told Major Stokes and Captain Booher that he had overdosed nine times when not on Suboxone. (*Id.* ¶ 50.)

That evening, a nurse informed Plaintiff that Suboxone had been removed from his medical chart and gave him an alternative assortment of detox medications including Imodium, Tylenol, and Meclizine. (*Id.* ¶ 46.) Plaintiff alleges his Suboxone was improperly discontinued as a form of punishment. (*Id.* ¶ 47.) He also alleges that the alternative detox

medications have been proven to be less than effective in the treatment of withdrawal and fall below accepted standards of treatment. (*Id.* ¶ 51.)

On August 10, 2023, Plaintiff saw Nurse Kimla McDaniel-Nagari after complaining about chest pains. (*Id.* ¶ 52.) Nurse McDaniel-Nagari told him that the chest pains were associated with anxiety from the loss of Suboxone. (*Id.*) He then requested to see Dr. St. Amour, but Nurse McDaniel-Nagari told him that Dr. St. Amour was in a meeting, and she would pass on a message. (*Id.* ¶ 54.) Plaintiff did not see Dr. St. Amour that day. (*Id.*)

On August 11, 2023, Plaintiff received a formal institutional charge for allegedly diverting Subutex.[2] (*Id.* ¶ 55.) On August 14, 2023, he attended a hearing on the charge, was found guilty, and had his "privileges" suspended for 15 days. (*Id.* ¶¶ 56–57, 59.) Plaintiff alleges that he was found guilty "for the sole reason that Major Stokes wrote the charge." (*Id.* ¶ 57.)

On August 15, 2023, Plaintiff was moved to segregation because he "wouldn't stop on the kiosk and wouldn't stop about [his] medication." (*Id.* ¶ 61.)

The next day, Plaintiff saw Dr. St. Amour. (*Id.* ¶ 63.) He requested to have his Suboxone continued, urging that if his Suboxone treatment were not restored "he would use drugs to relieve his withdrawal symptoms if the opportunity presented itself." (*Id.* ¶ 64.) He also offered to stay in segregation to rule out any security risk. (*Id.*) Dr. St. Amour told him the decision was up to Major Keller. (*Id.* ¶ 65.)

Plaintiff heard nothing for several days and continued to experience withdrawal symptoms, including restless legs, difficulty sleeping, and diarrhea. (*Id.* ¶ 66.) On August 18, 2023, Plaintiff pressed the medical call button in his cell, and Nurse Stout responded to him,

---

[2] Plaintiff alleges the formal charge mistakenly referenced "Subutex" rather than Suboxone. (Compl. ¶¶ 55, 58.)

- 4 -

saying, "You did what you did and are being punished for doing so, lay down and drink some water." (*Id.* ¶ 67.)

On August 21, 2023, Plaintiff was moved out of segregation. (*Id.* ¶ 62.) That day, Substance Abuse Counselor Leigh Ann Sparks offered him Vivitrol and a spot in the in-patient Residential Substance Abuse Treatment ("RSAT") program. (*Id.* ¶ 69.) Davis told her he already completed in-patient treatment and that he had previously tried Vivitrol with no success. (*Id.* ¶ 70.) That afternoon, Plaintiff obtained a grievance form, which he completed and returned the next day. (*Id.* ¶¶ 72–73.)

At some point thereafter, he was called to medical and offered Naltrexone. (*Id.* ¶ 75.) Plaintiff asked why he could not get a Sublocade injection, and Nurse Amos responded that "they did not have access to it." (*Id.* ¶ 76.) Plaintiff alleges that the real reason he was not offered Sublocade was because it was too expensive. (*Id.* ¶ 76.) He then requested a Sublocade injection, claiming the medical officials' refusal to provide the injection due to its cost was "denying him proper treatment." (*Id.* ¶ 77.) Plaintiff alternatively requested "a way to have his Suboxone administered to avoid [d]iversion," such as by crushing his medication. (*Id.* ¶ 74.) Plaintiff also informed the nurse that his withdrawal symptoms continued and had been "constantly ignored." (*Id.* ¶ 78.)

On August 25, 2023, Plaintiff was again called to medical where a nurse gave him Imodium and Ibuprofen and told him "he was not going to receive any treatment for his disease." (*Id.* ¶¶ 80, 82.) He tried to submit another grievance form, but Officer Hemlick, the grievance officer, told him his concerns were already being addressed and he did not need another form. (*Id.* ¶¶ 79, 83.) Hemlick also told him that Sparks said he was not showing any

signs of withdrawal. (*Id.*) Later that day, Sparks came to Plaintiff's cell and loudly told him he was a "drug addict," a liar, "mentally unstable," and that "he was lucky that she even responded to his emails." (*Id.* ¶ 85.) Plaintiff reported this incident to the grievance officer on August 26, 2023. (*Id.* ¶ 86.) Sparks also told Plaintiff in an email and in person that he should not have access to enough drugs to overdose in jail (*see id.* ¶ 103), and that she was against Suboxone and Methadone and would not advocate for him to be on Suboxone (*id.* ¶ 105). On August 27, 2023, Plaintiff reported to medical staff that his withdrawal symptoms "ha[d] not dissipated." (*Id.* ¶ 91.)

### B. Procedural History

Plaintiff filed this action on September 13, 2023, against Defendants Major Chad Keller; Major Derek Stokes; Captain Scott Booher; Leigh Ann Sparks; Dr. Bruce St. Amour; Kimla McDaniel-Nagari, APRN; Daphne Amos, RN; and Megan Stout, RN. (*See id.* at 1.) In his complaint, Plaintiff asserted the following claims under 42 U.S.C. § 1983:

> **Claim 1:** Defendants Keller, Stokes, Booher, and St. Amour violated his Eighth and Fourteenth Amendment rights by abruptly discontinuing his Suboxone before giving him an in-house disciplinary charge and using this termination of Suboxone as a form of punishment. (*Id.* ¶ 111.)
>
> **Claim 2:** Defendants Stout and McDaniel-Nagari refused to assess or treat his withdrawal and told him his medication was taken away as a form of punishment, in violation of the Eighth and Fourteenth Amendments. (*Id.* ¶ 112.)
>
> **Claim 3:** Defendant St. Amour failed to taper Davis off Suboxone, forcing him into withdrawal without any medical justification, in violation of the Eighth Amendment. (*Id.* ¶ 113.)
>
> **Claim 4:** Defendants St. Amour and McDaniel-Nagari failed to treat his withdrawal symptoms with detox protocol medications from August 15, 2023, until August 25, 2023, in violation of the Eighth and Fourteenth Amendments. (*Id.* ¶ 115.)

**Claim 5:** Defendants Amos, McDaniel-Nagari, and St. Amour failed to effectively treat Davis with a diversion-proof form of Suboxone, in violation of the Eighth and Fourteenth Amendments, Title II of the ADA, and Section 504 of the Rehabilitation Act. (*Id.* ¶ 116.)

**Claim 6:** Defendant Sparks violated the Eighth and Fourteenth Amendments in opining that Davis was not in withdrawal even though she was not a medical professional. (*Id.* ¶ 117.)

**Claim 7:** Defendant Sparks loudly shared Davis's private medical information to third parties, in violation of the Health Insurance Portability and Accountability Act ("HIPAA"). (*Id.*)

**Claim 8:** Defendants Stokes and Booher violated the Eighth and Fourteenth Amendments when they provided opinions and recommendations on Davis's condition even though they were not medically certified. (*Id.* ¶ 118.)

**Claim 9:** Defendants St. Amour, Keller, Stokes, and Booher abruptly discontinued effective treatment—Suboxone—for Davis's OUD, forcing him into withdrawal, in violation of the Eighth and Fourteenth Amendments. (*Id.* ¶ 119.)

On September 27, 2024, the court dismissed all of Plaintiff's claims against Defendants in their official capacities, all claims against Defendant Leigh Ann Sparks, and all claims against Defendant Daphne Amos for failure to state a claim for which relief could be granted. (*See* Order, Sept. 27, 2024 [ECF No. 60].)

Keller, Stokes, and Booher now seek summary judgment under Federal Rule of Civil Procedure 56, arguing that Plaintiff failed to properly exhaust his administrative remedies regarding his claims against them and that no reasonable jury would find that they were deliberately indifferent to Plaintiff's medical needs. (*See* Memo. in Supp. of Defs.' Mot. for Summ. J. 10–16 [ECF 76].)

## C. Defendants' Evidence

In support of their motion, Defendants offer evidence showing that, on August 8, 2023, Stokes received information from a confidential information that drug activity and related money exchanges were occurring in WVRJ Housing Unit 4C. (Decl. of D. Stokes ¶ 3 [ECF No. 76-1].) As part of Stokes's investigation into these allegations, he and Booher reviewed live video footage of Plaintiff and two other inmates and discovered that at least one of the inmates had diverted his medication. (*Id.* ¶ 4.) This prompted Stokes to review prior video footage of the three inmates during their medication administration. (*Id.* ¶ 5.) Stokes's review of video footage dating back to July 23, 2023, revealed multiple occasions where all three inmates had diverted their medications by waiting until medical and security staff were occupied and then either spitting their medication into their jumpsuits or spitting it into hands and placing it in their pockets. (*Id.*) Stokes specifically viewed footage from August 7, 2023, at 10:01 a.m. in which Plaintiff could be seen spitting his pill into his hand and putting it into his jumpsuit pocket. (*Id.* ¶ 6.)

Stokes and Booher met with WVRJ's medical providers to inform them that the three inmates, including Plaintiff, were diverting their medications. (*Id.* ¶ 7.) They presented the video evidence to Amos and Dr. St. Amour, who reviewed it. (*Id.*) Dr. St. Amour then removed all three inmates from their respective medical treatment protocols and placed them on detox protocols instead. (*Id.*)

Stokes and Booher then met with Plaintiff in Housing Unit A's main hallway. (*Id.* ¶ 8.) They advised Plaintiff that he was seen diverting his medication and would therefore no longer be receiving Suboxone. (*Id.*; Decl. of S. Booher ¶ 3 [ECF No. 76-2].) Plaintiff grew angry and

shouted and Stokes and Booher that they could not do that. (Decl. of D. Stokes ¶ 8; Decl. of S. Booher ¶ 3.) At first, Plaintiff adamantly denied diverting his medication but he eventually admitted to the diversion because he did not like taking the entire dose at once. (Decl. of D. Stokes ¶ 8; Decl. of S. Booher ¶ 5.) Plaintiff remained upset and threatened to sue Wellpath—the jail's medical provider—and WVRJ. (Decl. of D. Stokes ¶ 8; Decl. of S. Booher ¶ 5.)

At the August 14, 2023 hearing on Plaintiff's diversion charge, Plaintiff admitted to diverting his Suboxone medication and was found guilty. (Decl. of C. Keller ¶ 4.) The next day, Plaintiff was placed on punitive status and moved to restrictive housing. (*Id.* ¶ 5.) Plaintiff was released from punitive status and rehoused to a non-restrictive unit on August 21, 2023. (*Id.* ¶ 6.)

Stokes, Booher, and Keller maintain that they did not choose whether to discontinue Plaintiff's Suboxone regimen and lacked the authority to make such a choice. (Decl. of D. Stokes ¶ 9; Decl. of S. Booher ¶ 4; Decl. of C. Keller ¶ 3 [ECF No. 76-3].)

Defendants also offer the following evidence concerning the administrative exhaustion procedures at WVRJ and Plaintiff's exhaustion efforts.

The WVRJ grievance procedure is outlined in the inmate handbook, which all WVRJ inmates have access to. (Decl. of C. Keller ¶ 8.) The grievance procedure consists of two steps: an informal resolution stage and a formal resolution stage. (*Id.* ¶ 9.) First, an inmate must seek to informally resolve his complaint by addressing it with a housing unit officer, either by filling out a paper form or by filing an electronic grievance at a kiosk. (*Id.* ¶ 10.) Second, if the issue cannot be resolved informally, the inmate must participate in a three-step formal resolution process. (*Id.* ¶ 11.) The inmate handbook outlines the formal resolution process as follows:

> **Formal Resolution**
>
> The formal resolution stage is to be used if the grievance is not resolved in the informal resolution stage.
>
> 1. The Security Commander, Services Commander or his/her designee will determine if the complaint is grievable, non-grievable, or grievable but frivolous;
>
> 2. Reviews all pertinent information and responds to the complainant in writing within seven (7) business days.
>    ✓ If satisfied, stop.
>    ✓ If not satisfied, inmate must file appeal within **72 hours** for the Superintendent.
>
> 3. The <u>Superintendent</u> determines the merit of the complainant and responds in writing to the complainant. *(The Superintendent has 10 business days to respond to the complainant.)*
>
> For the purposes of an internal grievance procedure, the Superintendent is the final appeal authority. A copy of the original form will be provided to him at this point. **Inmates must have pursued their complaint(s) through Step II of the inmate grievance procedure before it will be deemed that all available administrative remedies have been exhausted.**

(Defs.' Mot. for Summ. J. Ex. E [ECF No. 76-5].) An inmate must appeal an unsatisfactory grievance decision to the Superintendent within 72 hours to effectively exhaust administrative remedies. (*See id.*; Decl. of C. Keller ¶¶ 13–14.)

Plaintiff filed an informal grievance complaint form on August 21, 2023 at 3:00 p.m., complaining:

> 1) I was removed from my prescription medication (Suboxone) prior to being found guilty of an institutional offense. 2) The security cannot make medical determinations for me. 3) I have been removed from my medication (16 mg a day to nothing) "cold turkey" and have been given no medical justification. 4) The administration process of the medication has changed to avoid diversion since my removal.

(Defs.' Mot. for Summ. J. Ex. D, at 1 [ECF No. 76-4].) In his informal complaint, he asked that he be placed back on his medication in a way that avoids diversion and, if necessary, even place him in medical segregation to continue his treatment for OUD. (*Id.*) He suggested giving

- 10 -

him his medication in a form that is "diversion proof," either by crushing the Suboxone pills or offering him Suboxone strips or a Sublocade injection. (*Id.*)

Grievance Officer Hemlick responded to Plaintiff's informal complaint on August 29, 2023, at 3:30 p.m. (*Id.*) In his response, Hemlick explained that Plaintiff's medication was discontinued based on Plaintiff's prior instances of diversion and that "[t]he video footage clearly showing you diverting the medication was not only reviewed by the jail's administrative staff, but by Wellpath's Health Services Administration as well, which led to medical discontinuing the medication." (*Id.* at 2.) Hemlick further explained that Plaintiff had been "given the opportunity to be prescri[bed] and receive medically approved alternative medications . . . as well as receiving therapeutic Drug treatment through the RSAT program, but you have adamantly refused both." (*Id.*) He also stated that, "upon speaking to the RSAT supervisor, she has informed me, that during her sessions and[/]or talks with you, that you are showing no signs and[/]or symptoms of withdrawal." (*Id.*) Hemlick ultimately determined that Plaintiff's complaint was "grievable, but without merit." (*Id.* at 1–2.)

On September 9, 2023, Plaintiff responded to Hemlick's response, indicating that he was "not satisfied," and listing several reasons for his dissatisfaction. (*See id.* at 3–5.) The complaint form indicated that "[c]omplaints which are determined to be GRIEVABLE or GRIEVABLE, BUT WITHOUT MERIT and are not satisfied at the informal level will be advanced to the formal inmate grievance process" once returned to the grievance officer. (*Id.* at 3.)

Major Keller received Plaintiff's formal grievance on September 18, 2023, at approximately 9:00 a.m. (Decl. of C. Keller ¶ 15.) Keller performed a Step I review of

Plaintiff's grievance and responded on September 25, 2023, at approximately 10:00 a.m., agreeing with Hemlick that Plaintiff's complaint was "grievable, but without merit." (*Id.*; Defs.' Mot. for Summ. J. Ex. D, at 6.) Plaintiff responded to Keller's Step I decision that he was "not satisfied." (Defs.' Mot. for Summ. J. Ex. D, at 6.) He stated that he needed his medication "for certain" and that the medication "keeps [him] sober." (*Id.*) He also suggested that he should have been kept in medical segregation rather than having his medication discontinued. (*Id.*) Plaintiff did not circle either option on the response form indicating that he wished to either "terminate this grievance" or "appeal this decision to the superintendent," (*id.*) and he never appealed Keller's decision to the Superintendent. (Decl. of C. Keller ¶ 16.)

### D. Plaintiff's Evidence

In response to Defendant's motion for summary judgment, Plaintiff filed a declaration swearing to the following facts.

On August 9, 2025, Plaintiff was given his Suboxone medication in the WVRJ medical department. (Decl. of R. Davis. 1 [ECF No. 81-1].) While receiving his medication, Plaintiff and two other inmates were strip searched for contraband. (*Id.*) One of the other inmates was found to have diverted his medication, but Plaintiff was cleared to return to his housing unit. (*Id.*) Later that day, Stokes and Booher approached Plaintiff in the hallway outside of his housing unit. (*Id.*) Stokes and Booher notified him that his medication was being discontinued. (*Id.*) They did not tell Plaintiff about the suspected drug activity or money exchanges in the unit or offer evidence suggesting he had sold his medication. (*Id.*) Plaintiff asked to see Dr. St. Amour, but Stokes and Booher denied his request. (*Id.*) Plaintiff claims that the decision to

terminate his medication was based on non-medical factors and that the Moving Defendants "played a direct part" in that decision. (*Id.* at 3.)

Plaintiff became upset that his medication was discontinued and was fearful about experiencing withdrawal symptoms. (*Id.* at 1–2.) He told Stokes and Booher that he intended to sue. (*Id.* at 2.) During their conversation, Stokes referred to Plaintiff as a "chronic complainer" for utilizing the jail's grievance procedures. (*Id.*)

Plaintiff admitted to Stokes and Booher that he attempted to save half of his daily medication so that he could take 8 mg in the morning and 8 mg at night rather than taking all 16 mg at once. (*Id.*) But Plaintiff claims that he never admitted to this at his hearing on the diversion charge. (*Id.*) He also asserts that he was given very little opportunity to speak at the hearing. (*Id.*) He claims that two non-party officers told him that he had no chance of winning his case because Stokes was the one who had written him up. (*Id.*) He claims his hearing was unfair and that the hearing officer was not impartial. (*Id.*) He further states that he was placed in restrictive housing *before* his hearing and not at his hearing. (*Id.*) And he represents that he lost good-time credits before he was sentenced on his criminal conviction.

Plaintiff declares that he complained for weeks to WVRJ staff about his withdrawal symptoms but was ignored. (*Id.*) He declares there was a 10-day period when he received no treatment or medication for his withdrawal symptoms. (*Id.* at 3.) He also urges that there was never a proper medical assessment of his withdrawal symptoms. (*Id.*) He states that he adamantly refused Vivitrol as an alternative medical, and no one bothered to discern the reason for his refusal "to make an inform[ed] decision" about his treatment. (*Id.*) He claims he had

been denied a Sublocade injection despite their being "funds . . . in place" to cover the cost of the injunctions. (*Id.* at 4.)

Concerning his exhaustion efforts, Plaintiff states that he intended his response to Keller's Step I review as an appeal based on his dissatisfaction with Keller's decision. (*Id.* at 3.) Plaintiff further states that he received Keller's response on September 26, 2023, and was inconveniently transferred to Middle River Regional Jail the next day. (*Id.*) He represents that he followed every possible step to exhaust administrative remedies and continued to "push the issues" after his transfer, with no success. (*Id.*)

Defendants' motion for summary judgment is now ripe for review.

## II.

Summary judgment under Rule 56 "allows a case to be resolved before and without a trial when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 352 (4th Cir. 2024) (citing Fed. R. Civ. P. 56(a)). "The court's role in ruling on such a motion is not to assess the truth of any fact alleged or to weigh facts, as would a jury in finding facts, but only to determine whether facts are disputed *and* whether the disputed facts are material." *Id.* (citations omitted).

In deciding a motion for summary judgment, "the court construes all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Tekmen v. Reliance Standard Life Ins. Co.*, 55 F.4th 951, 958 (4th Cir. 2022). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874−75 (4th Cir.

1992). And "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Smith v. Ozmint*, 578 F.3d 246, 254 (4th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate if there are genuine disputes of material fact and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.*, but is appropriate "when the evidence is so one-sided that one party must prevail as a matter of law." *Tekmen*, 55 F.4th at 959.

## III.

The Moving Defendants seek summary judgment on Plaintiff's claims against them on the grounds that Plaintiff failed to properly exhaust his administrative remedies before filing suit and that no reasonable jury would find that Keller, Stokes, and Booher were deliberately indifferent to Plaintiff's medical needs. (*See* Memo. in Supp. of Defs.' Mot. for Summ. J. 10–16.) Because the court agrees that the Moving Defendants are entitled to judgment as a matter of law on Plaintiff's deliberate-indifference claims, the court will grant their motion for summary judgment without deciding whether Plaintiff exhausted available administrative remedies.

Plaintiff's claims arise under 42 U.S.C. § 1983, which authorizes a civil action by a citizen deprived of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States by a person acting under color of state law. To state a claim under § 1983,

a plaintiff must allege both (1) "the violation of a right secured by the Constitution and laws of the United States" and (2) "that the alleged deprivation was committed by a person acting under color of state law." *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011) (quoting *West v. Atkins,* 487 U.S. 42, 48 (1988)).

Plaintiff's complaint raises three claims against Keller, Stokes, and Booher, all of which relate to their alleged deliberate indifference to his serious medical needs. (*See* Compl. ¶ 111 (alleging Keller, Stokes, and Booher violated his Eighth and/or Fourteenth Amendment rights by abruptly discontinuing his Suboxone as punishment for a disciplinary charge); *id.* ¶ 118 (alleging Stokes and Booher violated Plaintiff's Eighth and/or Fourteenth Amendment rights by providing medical opinions and recommendations despite not being medically trained); *id.* ¶ 119 (alleging Keller, Stokes, and Booher discontinued Plaintiff's effective treatment for OUD and forcing him to undergo withdrawals in violation of the Eighth and/or Fourteenth Amendments).)

As the court explained at the motion-to-dismiss stage, when a plaintiff was a pretrial detainee at the time of the alleged deliberate indifference, his claims arise under the Fourteenth Amendment, which protects pretrial detainees from governmental actions that are "not rationally related to a legitimate nonpunitive purpose or that [are] excessive in relation to that purpose." *Jenkins v. Woodard*, 109 F.4th 242, 250 n.3 (4th Cir. 2024) (quoting *Short v. Hartman*, 87 F.4th 593, 599); *see Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021) ("[S]ince [the plaintiff] was a pretrial detainee and not a convicted prisoner, the Fourteenth Amendment, and not the Eighth Amendment, governs his claim." (citations and internal quotation marks omitted)). To

establish deliberate indifference to medical needs under the Fourteenth Amendment, the plaintiff must demonstrate:

> (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 2631 (2024).

The Moving Defendants challenge Plaintiff's claims based on his inability to show that they failed to act appropriately or that their actions actually caused harm to Plaintiff. (*See* Memo. in Supp. of Defs.' Mot. for Summ. J. 14.) They urge that none of them actually caused the discontinuance of Plaintiff's Suboxone prescription and that they lacked the authority to do so. (*See id.* (arguing that only Dr. St. Amour had the authority to discontinue or resume Plaintiff's medication).)

Federal courts faced with similar circumstances have found that jail staff are not deliberately indifferent to an inmates' serious medical needs merely by reporting suspected diversion to a medical provider. *See, e.g.*, *Flournoy v. Basu*, No. 23-CV-04798-CRB (PR), 2025 WL 1937594, at *7 (N.D. Cal. Mar. 18, 2025) (holding deputy defendant was "entitled to summary judgment on plaintiff's due process claim of deliberate indifference to serious medical needs against [him] because plaintiff has not set forth sufficient probative evidence for a reasonable jury to find that [his] decision to report plaintiff of attempting to divert his Suboxone . . . put plaintiff 'at substantial risk of suffering serious harm'" since there was "no significantly probative evidence in the record that plaintiff suffered acute withdrawal

symptoms during the acute phase of his withdrawal protocol that were left untreated by medical staff and thereby put him at substantial risk of suffering serious harm" (cleaned up)); *cf. Chambers v. May*, No. CV 25-127-MN, 2025 WL 1342737, at *5 (D. Del. May 8, 2025), *report and recommendation adopted*, No. CV 25-127 (MN), 2025 WL 1696439 (D. Del. June 17, 2025) (dismissing Eighth Amendment deliberate-indifference claim against officials who reported diversion and found plaintiff guilty of diversion at disciplinary hearing, noting that, though they were involved in the disciplinary aspects relating to his diversion, there were not personally involved in discontinuing the plaintiff's Suboxone regime and that it was reasonable for them, as non-medical personnel, to defer to the medical decisions made by the facility's medical provider); *Sanchez v. Docs Med. Dep't*, No. 12-CV-141-LJV-MJR, 2016 WL 5956072, at *4 (W.D.N.Y. Aug. 16, 2016), *report and recommendation adopted*, No. 12-CV-141(LJV)(MJR), 2016 WL 5956378 (W.D.N.Y. Oct. 13, 2016) (recommending that the court grant summary judgment on Eighth Amendment deliberate-indifference claim in favor of defendant who did not make the decision to discontinue the plaintiff's medication and lacked the power to prescribe or discontinue medications). As in these cases, Plaintiff has not shown that Stokes and Booher's decision to report Plaintiff's diversion to Dr. St. Amour, or Keller's finding Plaintiff guilty on his diversion charge, posed an unjustifiably high risk of harm to Plaintiff. *See Short*, 87 F.4th at 611.

None of the moving Defendants made the medical decision to discontinue Suboxone and prescribe detox medications rather than offering Suboxone in another form. "If a prisoner is under the care of medical experts, a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands." *Iko v. Shreve*, 535 F.3d 225, 242 (4th Cir. 2008)

(quoting *Spruill v. Gillis,* 372 F.3d 218 (3d Cir. 2004)). Here, the undisputed evidence shows that Plaintiff was under the care of Dr. St. Amour and WRVJ medical staff at the time Stokes and Booher reported his diversion and Keller found him guilty of diversion. The Moving Defendants had no active role in choosing how to treat Plaintiff's OUD following his diversion. That decision was, appropriately, left to medical experts, and the Moving Defendants are not liable for the discontinuance of or failure to re-prescribe Plaintiff's Suboxone regimen.

To the extent Plaintiff claims that Keller, Stokes, and Booher separately violated the Fourteenth Amendment by contributing to the discontinuation of his medication as a punishment for his diversion and before any hearing on the diversion charge, that claim also fails. To establish a due-process violation, a § 1983 Plaintiff must show that their actions were "not rationally related to a legitimate nonpunitive purpose" or were "excessive in relation to that purpose." *Short*, 87 F.4th at 609 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015)). Preventing the abuse of prescription medications within a jail is a legitimate, nonpunitive purpose for reporting and charging diversion. *See Jaime v. Kern Med.*, No. 1:23-CV-01145-NODJ-SAB (PC), 2024 WL 100968, at *3 (E.D. Cal. Jan. 9, 2024) (discontinuing pretrial detainee's Suboxone prescription after suspected diversion "reasonably advanced the legitimate correctional goal of curbing prescription medical abuse, dependency and potential diversion" and therefore did not violate the Fourteenth Amendment); *see also Harral v. Aluker*, No. 2:16-CV-0027-WTL-DKL, 2017 WL 770235, at *5 (S.D. Ind. Feb. 28, 2017) (finding there was "a reasonable basis" for terminating inmate's prescriptions after he diverted his medications). And by reporting and reviewing evidence related to Plaintiff's diversion, the

- 19 -

Moving Defendants did not actually facilitate the discontinuation of his medicine. The decision to switch Plaintiff to a detox regimen rather than providing him with Suboxone in another form was made by the jail's medical department, not by Stokes, Booher, or Keller. Based on these undisputed material facts, no reasonable jury could find Stoker, Booher, or Keller liable for any alleged constitutional injury caused by the discontinuation of Plaintiff's Suboxone prescription. The Moving Defendants are therefore entitled to judgment as a matter of law on Plaintiff's claims against them.

## IV.

For the reasons set forth above, the court will grant the Moving Defendants' motion and award summary judgment in their favor on all claims against them.

The Clerk is directed to send a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 29th day of September, 2025.

> */s/ Thomas T. Cullen*
> HON. THOMAS T. CULLEN
> UNITED STATES DISTRICT JUDGE